**Floyd F. ROYSDON, and wife, Ruth Ann Roysdon, Plaintiffs–Appellants,**

v.

**R.J. REYNOLDS TOBACCO COMPANY, Defendant–Appellee.**

No. 86–5072.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 30, 1987.

Decided June 14, 1988.

Rehearing and Rehearing En Banc Denied Aug. 1, 1988.

J.D. Lee (argued), Knoxville, Tenn., Ted Q. Wilson, Oneida, Tenn., for plaintiffs-appellants.

Ray H. Moseley, Chattanooga, Tenn., Robert R. Campbell, Hodges, Doughty & Carson, Knoxville, Tenn., John L. Strauch (argued), Paul G. Crist, Jones, Day, Reavis & Paque, Cleveland, Ohio, for defendant-appellee.

Before: RYAN and BOGGS, Circuit Judges; and BROWN, Senior Circuit Judge.

RYAN, Circuit Judge.

Floyd Roysdon and his wife appeal from the district court's dismissal of their failure to warn claim against R.J. Reynolds Company (Reynolds), and grant of Reynolds' motion for directed verdict with respect to their products liability claim based on allegations that defendant's cigarettes are "defective and unreasonably dangerous." *Roysdon v. R.J. Reynolds Tobacco Co.*, 623 F.Supp. 1189 (E.D.Tenn.1985). We affirm the district court's holding that the "failure to warn" claim is preempted by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–1341, and we affirm that court's order of a directed verdict with respect to the "defective and unreasonably dangerous" claim.

## I.

Floyd Roysdon began smoking "Camel" cigarettes, a product of the R.J. Reynolds Company, in 1946. In the 1960's, he switched brands to "Winston," another Reynolds product. Due to his addiction, Mr. Roysdon has been unable to stop smoking. On November 30, 1983, Mr. Roysdon had surgery on his left foot. Two surgical incisions on the foot failed to heal due to severe peripheral atherosclerotic vascular disease, and Mr. Roysdon's left leg had to be amputated below the knee. At the trial, there was testimony linking smoking to vascular disease and Mr. Roysdon's doctors testified that his vascular disease was caused by his smoking.

Thereafter, Mr. Roysdon and his wife filed this products liability action against Reynolds[1] on July 5, 1984, in a Tennessee Circuit Court. The case was removed to the United States District Court for the Eastern District of Tennessee pursuant to 28 U.S.C. § 1441(a), based on the existence of diversity jurisdiction. The Roysdons asserted two claims: that Reynolds failed to adequately warn Roysdon of the risk of vascular disease, and that Reynolds cigarettes are defective and unreasonably dangerous. Pursuant to Tenn.Code Ann. § 29–28–103, the district court limited the Roysdons' recovery to harm allegedly caused by Mr. Roysdon's smoking of Reynolds cigarettes within the ten years immediately preceding commencement of this suit (1974–1984). The district court dismissed the inadequate warning claim before trial. After the close of plaintiffs' proof, the district court granted Reynolds' motion for a directed verdict on the "defective and unreasonably dangerous" issue because the court found that the Roysdons had failed to establish a jury case as to whether the cigarettes were unreasonably dangerous.

## II.

We address first our determination that the claim based on Reynolds' failure to adequately warn Roysdon is preempted by the Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–1341 (1982). It is undisputed that Reynolds has fully complied with the provisions of that Act at all relevant times. The Roysdons contend, however, that despite this compliance, Reynolds may be liable under state law for the failure to adequately warn Mr. Roysdon of the health risks presented by smoking.

### A.

### *The Federal Cigarette Labeling and Advertising Act*

The Federal Cigarette Labeling and Advertising Act, originally enacted in 1965,

---

1. Defendants R. J. Reynolds Industries, Inc., and The Tobacco Institute, were dismissed by the district court. These dismissals were not further contested by the plaintiffs.

established the requirement of mandatory warning labels for cigarette packages.[2] The Act contains an express statement of its purposes:

It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

(1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and

(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

15 U.S.C. § 1331 (1982).[3]

Additionally, the Act contains a preemption section:

(a) No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled

in conformity with the provisions of this chapter.

15 U.S.C. § 1334 (1982).[4]

### B.

### *Preemption*

■ The Supremacy Clause of Article VI of the Constitution provides that the Constitution or laws of the United States can preempt state law. The key inquiry to be made when it is claimed that a federal statute has preemptive effect is "whether Congress intended that federal regulation supersede state law." *Louisiana Public Serv. Comm'n v. Federal Communications Comm'n,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369, 382 (1986). Congressional intent to preempt state law may be ascertained in several ways.

First, when acting within constitutional limits, Congress is empowered to preempt state law by so stating in express terms. *E.g., Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

. . . .

As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may

---

**2.** The original required warning—"Caution: Cigarette Smoking May Be Hazardous to Your Health"—was strengthened effective in 1970 to: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." 15 U.S.C. § 1333 (1965), *amended by* 15 U.S.C. § 1333 (1970). In 1984, Congress further revised the warning and stipulated four warnings to be rotated among cigarette packages. 15 U.S.C. § 1333 (Supp.1988).

**3.** Paragraph one was amended in 1984 to state: "(1) the public may be adequately informed about any adverse health effects of cigarette

smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes...." 15 U.S.C. § 1331(1) (Supp.1988).

**4.** Originally, in the 1965 Act, subsection (b) read as follows:

No statement relating to smoking and health should be required in the advertising of any cigarettes the packages of which are labeled in conformity with this Act.

15 U.S.C. § 1334(b) (1965), *amended by* 15 U.S. C. § 1334(b) (1970).

nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *See Michigan Canners & Freezers Assn., Inc. v. Agricultural Marketing and Bargaining Bd.,* 467 U.S. 461, 478, 104 S.Ct. 2518, 2528, 81 L.Ed.2d 399 (1984); *Fidelity Federal Savings & Loan Assn. v. De la Cuesta,* 458 U.S. 141, 156, 102 S.Ct. 3014, 3024, 73 L.Ed.2d 664 (1982). Nevertheless, pre-emption is not to be lightly presumed. See *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981).

*California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, ——, 107 S.Ct. 683, 689, 93 L.Ed.2d 613, 623–24 (1987).

■ First, we agree with the other circuits that have addressed this issue that § 1334 of the Act does not expressly preempt state law claims. *Cipollone v. Liggett Group, Inc.,* 789 F.2d 181, 185–86 (3rd Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987); *Palmer v. Liggett Group, Inc.,* 825 F.2d 620, 625 (1st Cir.1987). While keeping in mind the presumption that "Congress did not intend to displace state law," *e.g., Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), we look to the language of § 1334. We find no language indicating congressional intent to displace state common law claims. *Accord Cipollone,* 789 F.2d at 185; *Palmer,* 825 F.2d at 625. Like the First Circuit, we find no need to delve into the meaning of the

lack of an explicit clause preempting state law claims or expressly preserving such claims. *Palmer,* 825 F.2d at 625. Therefore, we now turn our focus to the doctrine of implied preemption.

■ Inasmuch as we find the Roysdons' failure to warn claim under state law implicitly preempted because it "actually conflicts" with the Act, we will not address whether it is preempted because Congress has "occupied the field." [5] As we have observed, a state regulation may actually conflict with a federal provision if it is a "physical impossibility to comply with both," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or if the state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Although it would not be a physical impossibility for the cigarette companies to provide additional warnings beyond those required by the Act, we agree with the Third Circuit that

> claims related to smoking and health that result in liability for noncompliance with warning, advertisement, and promotion obligations other than those prescribed in the Act have the effect of tipping the Act's balance of purposes and therefore actually conflict with the Act.

*Cipollone,* 789 F.2d at 187.

The Act's purposes, as expressed in § 1331, are to insure that: "[t]he public may be adequately informed that cigarette smoking may be hazardous to health ...," and that "commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 U.S.C. § 1331 (1982). The Act "represents a carefully drawn balance between

---

**5.** Whether the Act indicates that Congress intended to occupy the field and therefore preempt the state common law claims has been thoroughly discussed in *Cipollone v. Liggett Group, Inc.,* 593 F.Supp. 1146, 1163–66 (D.N.J. 1984), *rev'd,* 789 F.2d 181 (3rd Cir.1986). The

district court's analysis was cited with approval in *Cipollone,* 789 F.2d at 186. Both courts determined that Congress had not intended to occupy the field relating to cigarettes and health to the exclusion of state product liability claims. *Id.;* 593 F.Supp. at 1165–66.

the purposes of warning the public of the hazards of cigarette smoking and protecting the interests of the national economy." *Cipollone*, 789 F.2d at 187. Therefore, we agree that "[i]t is inconceivable that Congress intended to have that carefully wrought balance of national interests superseded by the views of a single state, indeed, perhaps of a single jury in a single state." *Palmer*, 825 F.2d at 626. Accordingly, we find that the Roysdons' claim based on Reynolds' failure to provide adequate warnings—when in fact Reynolds provided the warnings required by the Act —is preempted by the Act.

### III.

■ In addition to their failure to warn claim, the Roysdons also alleged that Reynolds cigarettes were "defective and unreasonably dangerous due to their harmful contents...." According to the district court's opinion, the parties conceded that Tennessee law required the Roysdons to show that cigarettes were *both* defective and unreasonably dangerous, and the court applied the parties' interpretation of the law to the facts. *Roysdon*, 623 F.Supp. at 1191. Accordingly, the court directed a verdict in Reynolds' favor because the court determined that the Roysdons had failed to establish a *prima facie* case that the cigarettes were "unreasonably dangerous." Regardless of whether the parties agree upon an interpretation of the law, the district court has an independent duty to determine if that interpretation is correct.

Therefore, as a preliminary matter, we must determine whether, under Tennessee law, a products liability action will lie where the product is *either* defective or unreasonably dangerous, or only when the product is *both* defective and unreasonably dangerous. The Tennessee General Assembly enacted Public Acts of 1978, Chapter 703, § 5, which has been codified as Tenn.Code Ann. § 29–28–105(a). That section provides:

(a) A manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product

unless the product is determined to be in a defective condition *or* unreasonably dangerous at the time it left the control of the manufacturer or seller.

*Id.* (emphasis added).

■ Prior to the enactment of § 29–28–105, Tennessee had judicially adopted § 402A of the Restatement (Second) of Torts (1966), which requires the plaintiff to prove that the product was both defective and unreasonably dangerous. *Ellithorpe v. Ford Motor Co.*, 503 S.W.2d 516 (Tenn.1973). However, it is clear from the plain language of the statute and its legislative history that the criteria for liability were intended to be read in the disjunctive ("or") rather than the conjunctive ("and"). *Smith v. Detroit Marine Engineering Corp.*, 712 S.W.2d 472, 474 (Tenn. App.1985), *application for permission to appeal denied* (June 30, 1986). In *Smith*, the relevant history was presented as follows:

During the debate in the House of Representatives, Representative Ashford ... moved to amend the bill by deleting the word "and" between "condition and unreasonably," and substituting instead the word "or." Representative Ashford stated to the House as follows:

Mr. Speaker, ladies and gentlemen of the House, the substitution of the word "or" for "and" allows an action to be brought for a defective condition in a product, or for an unreasonably dangerous condition in a product rather than requiring that the product be defective and unreasonably dangerous and I think probably the sponsors of the bill indicated that they approve of this type of a change which allows both a defective condition of a product that might not be unreasonably dangerous and for an unreasonably dangerous product, and I'd move adoption of the amendment.

*Id.* at 474–75. Clearly, the Tennessee legislature intended to deviate from § 402A and allow a products liability action when the product is either defective or unreasonably dangerous.

We must determine, therefore, whether the district court properly granted a directed verdict with respect to *both* bases for the claim since plaintiffs pleaded both bases for liability. A federal court sitting in diversity is bound to apply the standard for directed verdict of the state whose substantive law governs the action. *Arms v. State Farm Fire & Casualty Co.,* 731 F.2d 1245, 1248 (6th Cir.1984). Tennessee law requires that trial judges and appellate courts

> take the strongest legitimate view of the evidence in favor of the plaintiff, allow all reasonable inferences to be drawn therefrom in his favor, discard all countervailing evidence and deny the motion if there is any doubt as to the conclusions to be drawn from the whole evidence; a verdict should only be directed if reasonable minds could draw but one conclusion.

*Sauls v. Evans,* 635 S.W.2d 377, 379 (Tenn. 1982).

Tennessee law defines a "defective condition" as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29–28–102(2). Thus, consumer knowledge about the risks inherent in the use of a product is one factor to be considered when determining if a product is defective. The normal use of cigarettes is known by ordinary consumers to present grave health risks, but that is not to say that defendant's cigarettes, when they left the hands of the manufacturer or seller, were flawed in the sense that they were "improperly manufactured" or contained "dangerous impurities." *Pemberton v. American Distilled Spirits Co.,* 664 S.W. 2d 690, 692 (Tenn.1984). Moreover, the Roysdons make no allegation and offered no proof that these cigarettes were "improperly manufactured" or contained "dangerous impurities." They claim simply that since Mr. Roysdon suffered illness that was caused by smoking the defendant's product, the product was therefore defective. But that is not the sense in which the *Pemberton* court, speaking in the context of the consumption of an exces-sive amount of an alcoholic beverage, defined "defective condition."

Because the record contains no evidence whatever that the use of the defendant's cigarettes presents risks greater than those known to be associated with smoking, we find that a reasonable jury could not find that the cigarettes were defective. Therefore, unless there is a jury question with respect to whether the defendant's cigarettes are "unreasonably dangerous," the verdict in favor of Reynolds was proper.

A product is "unreasonably dangerous" if it is "dangerous to an extent beyond that which could be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics." Tenn.Code Ann. § 29–28–102(8). According to the Supreme Court of Tennessee, this can be determined from the "knowledge of the ordinary consumers of the products." *Pemberton,* 664 S.W.2d at 692. With this in mind, the district court took judicial notice that "tobacco has been used for over 400 years and that its characteristics have also been fully explored. Knowledge that cigarette smoking is harmful to health is widespread and can be considered part of the common knowledge of the community." *Roysdon,* 623 F.Supp. at 1192. Remembering that this action was limited to the ten years preceding the filing of this complaint, we think this approach was appropriate. The extensive information regarding the risks of smoking available to the public during that time precluded the existence of a jury question as to whether cigarettes are unreasonably dangerous. We find that whether there was knowledge regarding Mr. Roysdon's specific medical problem is irrelevant in light of the serious nature of the other diseases known at that time to be caused by cigarette smoking.

For the above reasons we AFFIRM the district court's dismissal of the Roysdons' failure to warn claim and order directing a verdict in Reynolds' favor on the defective or unreasonably dangerous product issue.